## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

DARRELL WAYNE FREDERICK,    )
            )
      Petitioner,      )
            )
    vs.           )     Case No. CIV-19-37-SLP
            )
TOMMY SHARP, Warden,    )
Oklahoma State Penitentiary    )
            )
      Respondent.    )

## MEMORANDUM OPINION

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. [Doc. No. 20]. Petitioner challenges the conviction entered against him in Oklahoma County District Court Case No. CF-2011-1946. Tried by a jury in 2014, Petitioner was found guilty of first-degree murder, assault with a dangerous weapon after former conviction of a felony, and domestic abuse – assault and battery. Petitioner was sentenced to death for the murder, 25 years imprisonment for the assault with a dangerous weapon, and one-year imprisonment for the domestic abuse charge. In support of the death sentence, the jury found three aggravating circumstances: (1) Petitioner had a prior violent felony conviction, (2) the murders were especially heinous, atrocious, or cruel, and (3) there is a probability that Petitioner poses a continuing threat to society. Criminal Appeal Original Record ("O.R.") vol. V, 928.

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals ("OCCA"). The OCCA affirmed in a published opinion. *Frederick v. Oklahoma*, 400 P.3d 786 (Okla. Crim. App. 2017), *cert. denied*, 138 S. Ct. 997 (2018).

Petitioner also filed an application for post-conviction relief and sought an evidentiary hearing regarding certain ineffective assistance of counsel and prosecutorial misconduct claims. The OCCA remanded the case for an evidentiary hearing regarding these issues. *See* Order Remanding for Evidentiary and Order Denying the Motion for Discovery on Post-Conviction Claims and the Motion to Reserve the Right to Supplement Original Application on Post-Conviction Relief, *Frederick v. Oklahoma*, PCD-2015-47 (Okla. Crim. App. Dec. 20, 2018).

The trial court held the evidentiary hearing over the course of four days. In its written findings of fact and conclusions of law, the trial court found that the prosecutorial misconduct claim lacked merit and appellate counsel was not ineffective because the underlying claims of trial counsel ineffectiveness lacked merit. *See* Order of February 9, 2018, *Frederick*, PCD-2015-47.  After supplemental briefing from the parties, the OCCA denied Petitioner's application for post-conviction relief in an unpublished opinion. *Frederick v. Oklahoma*, No. PCD-2015-47 (Okla. Crim. App. Dec. 20, 2018).

Petitioner now seeks habeas relief and presents four grounds for relief.  Respondent has responded to the petition [Doc. No. 27] and Petitioner has replied [Doc. No. 32]. Petitioner also filed motions for discovery and an evidentiary hearing to which responses were filed [Doc. Nos. 21, 24, 26, 28].  After a thorough review of the entire state court record (which Respondent has provided), the pleadings and materials submitted in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to the requested relief.

## I.  Facts.

In adjudicating Petitioner's direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted, the Court finds that in regard to the facts set out below, Petitioner has not done so, and that the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

> On March 26, 2011, between 5:30 and 6:30 p.m., Da'Jon Diggs arrived at the home of her grandmother, Connie Frederick (hereinafter referred to as the deceased). The deceased was 85 years old and had been deaf and mute her entire life. She lived in the same house in northeast Oklahoma City in which she had raised six children. Ms. Diggs attended college in another city but frequently stopped by to check on the deceased. Ms. Diggs, like much of her family, communicated with the deceased through sign language. Also living at the deceased's home at the time was [Petitioner], her fifty-five (55) year old son. He had been living with the deceased since his release from prison in 2009.

> Ms. Diggs entered the home to find [Petitioner] and the deceased "fussing" in the kitchen. Ms. Diggs later explained that despite being mute for speech purposes, the deceased could still make some sounds and was "yelling" at [Petitioner] through guttural noises and sign language involving exaggerated movements with her hands. Ms. Diggs saw [Petitioner] aggressively grab food out of the deceased's hands. [Petitioner] called the deceased a "bitch" and told her to get out of the kitchen. He then shoved her against the kitchen counter. Ms. Diggs intervened and took the deceased to her bedroom, where she was able to calm her.

> Meanwhile, [Petitioner] had retreated to his own bedroom. When Ms. Diggs returned to the kitchen to get the deceased a drink of water, [Petitioner] appeared and told her not to take anything to the deceased. Ms. Diggs ignored this warning and took something to eat and drink to the deceased. The deceased wanted juice instead of water and tried to go to the kitchen. However, [Petitioner] prevented her from entering the kitchen. Ms. Diggs then volunteered to go to the store for some juice.

> While out of the house, Ms. Diggs phoned both her mother, who lived out of state, and her uncle, Tobias Frederick, to discuss her frustrations with

[Petitioner]. Both were the deceased's children and Tobias Frederick was an Oklahoma City Police Officer. Ms. Diggs told both her mother and her uncle that she was afraid [Petitioner] would seriously hurt her or the deceased. When Ms. Diggs returned to the house, she heard [Petitioner] answer the phone. Ms. Diggs was able to determine that it was her uncle Tobias that had called. He told [Petitioner] that he had to leave the deceased's home and find another place to live. [Petitioner] replied angrily, "man, I ain't got time for this" and hung up the phone. Ms. Diggs could hear [Petitioner] yelling into the phone. Ms. Diggs headed for the deceased's bedroom and told her to stay in the bedroom no matter what happened. Ms. Diggs then shut the bedroom door.

Ms. Diggs headed into another room to retrieve her phone and call police when [Petitioner] charged at her yelling, "oh, you have a problem with me too? I'll take you bitch." [Petitioner] attacked Ms. Diggs, shoving her against the wall. The struggle moved from room to room with Diggs attempting to defend herself. Eventually, she was able to push [Petitioner] off of her, causing him to stumble and she ran out of the house. [Petitioner] chased after her.

Outside, neighborhood kids were playing. Seeing [Petitioner] chase after Ms. Diggs, they shouted at her that [Petitioner] had a brick or rock in his hand. [Petitioner] chased Ms. Diggs around the yard, waving the brick or rock at her. Ms. Diggs ran to the neighbor's home and borrowed a phone to call the police. [Petitioner], who was dressed only in pajama pants, shouted at the neighborhood children and ran inside the house. He returned a few minutes later, fully dressed. By the time police arrived, [Petitioner] had run around the back of the house. Bystanders heard the rattle of a chain link fence and [Petitioner] was not seen or heard from the rest of the day.

Ms. Diggs followed police into the deceased's home. They found the deceased lying face down on the floor in her bedroom. The deceased had severe bruising and swelling on both sides of her head to the extent that one eye was nearly swollen shut. When asked who injured her, the deceased signed the letter "D" which she used to identify [Petitioner]. The deceased was taken to the hospital. Once there, she was immediately operated on to reduce the pressure in her brain. She had developed a significant subdural hematoma on the left side of her skull. The deceased survived the surgery but never regained consciousness. She passed away two to three weeks later. The cause of death was listed as blunt force trauma to the head.

[Petitioner] was located a day after the deceased's beating. He was found walking along the street approximately three blocks from the

deceased's home. When approached by police, he initially gave a false name but soon admitted his identity. His right hand was significantly swollen and his right finger was cut and bleeding. There was blood on his clothes. Bloodstains were also found in his bedroom at the decedent's home. Further facts will be set forth as necessary.

*Frederick*, 400 P.3d at 798-799.

## II.  Standard of Review.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") circumscribes the Court's review of claims that were adjudicated on the merits in state court proceedings.  28 U.S.C. § 2254; *see also Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011).  Where the state court adjudicated a claim on the merits, this Court may reach the merits of the claim only if the petitioner can establish that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   *Id*. at § 2254(d)(2).

Clearly established federal law under § 2254(d)(1) refers to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A decision is "contrary to" clearly established federal law if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal

principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

Under § 2254(d)(2), relief is only permitted where the state court's decision is "based on" the unreasonable factual determination. *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011). An unreasonable factual determination is one that is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, (2003).

Importantly, the "question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Habeas relief is warranted only where there is no "possibility for fairminded disagreement" with the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 102-103 (2011); *see also Brumfield v. Cain*, 576 U.S. 305, 135 S.Ct. 2269, 2277 (2015). This standard was meant to be difficult to meet and "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-103 (citation omitted). When reviewing a claim under section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. Analysis

Petitioner raises four grounds for relief: (1) trial and appellate counsel were ineffective; (2) statements made by the victim, Ms. Frederick, were improperly admitted in violation of the Confrontation Clause, (3) statements made by the prosecutors during

closing argument rendered the proceedings fundamentally unfair, and (4) the accumulation of errors resulted in a violation of his constitutional rights.

## A. Ground One: Ineffective Assistance of Counsel

Petitioner's first ground for relief raises several ineffective assistance of counsel claims, all of which are premised on appellate counsel's failure to include specific trial counsel ineffectiveness claims on direct appeal.[1]  Regarding the guilt stage, Petitioner argues that appellate counsel should have challenged trial counsel's failure to retain an independent medical expert and failure to adequately cross-examine the state medical examiner.  Regarding the sentencing stage, Petitioner argues that appellate counsel should have challenged trial counsel's failure to investigate and present testimony from family members, failure to present testimony from sociologist Dr. Art Williams, and failure to present evidence of brain damage.  After setting out the clearly established federal law, the Court will address each of these subclaims in turn.

### 1. Clearly Established Law

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must show that "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  On habeas review, courts must apply the highly deferential standards of *Strickland* and AEDPA to the facts of the case and decide whether "there is any reasonable argument that counsel

---

[1] In connection with his ineffective assistance of counsel claims, Petitioner refers to new evidence he has offered for the first time in this federal court proceeding. However, the Court's review under § 2254(d) is limited to the same record that was before the state court. *Pinholster*, 563 U.S. at 181

satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. A state court's ruling cannot be disturbed unless the petitioner demonstrates that the state court applied the highly deferential *Strickland* test in a way that every fair-minded jurist would agree was incorrect. *Id.*

Regarding deficient performance, the Supreme Court has held that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. Of course, whether an attorney's conduct is reasonable will depend on the facts of the particular case. *Id.* at 688. To avoid the "distorting effects of hindsight," an attorney's conduct should be judged "from counsel's perspective at the time." *Id.* at 689-90. Review of an attorney's performance is highly deferential and there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

In addition to deficient performance, a petitioner must also show that his counsel's errors were prejudicial to the defense. *Id.* at 692. Prejudice exists where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "If the alleged ineffective assistance occurred during the guilt stage, the question is whether there is a reasonable probability the jury would have had reasonable doubt regarding guilt." *Moore v. Gibson*, 195 F.3d 1152, 1178 (10th Cir. 1999). If the alleged ineffective assistance occurred during the sentencing stage, the court must consider "whether there is a 'reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and

mitigating circumstances did not warrant death.'" *Id.* (quoting Strickland, 466 U.S. at 695). In evaluating prejudice, courts must look "at the totality of the evidence, not just the evidence helpful to the petitioner." *Id.*

*Strickland's* standard also governs claims of ineffective assistance of appellate counsel. *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001). When analyzing a claim of ineffective assistance of appellate counsel for failure to raise an issue, courts "look to the merits of the omitted issue." *Hooks v. Ward,* 184 F.3d 1206, 1221 (10th Cir. 1999). Deficient performance may be established if appellate counsel omitted an issue that is "so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). If appellate counsel fails to raise a claim that has some merit, but is not compelling, courts must view the issue in light of the rest of the appeal and give deference to counsel's professional judgment. *Id.* Of course, if an "issue is meritless, its omission will not constitute deficient performance." *Id.* Even if a petitioner succeeds in the difficult task of identifying a meritorious claim that appellate counsel neglected, he must still demonstrate that, absent the appellate counsel's deficient performance, there is a reasonable probability that the petitioner would have prevailed on appeal. *Smith*, 528 U.S. at 285.

### 2. *Analysis of Guilt-Stage Ineffectiveness Claims*

#### a. Failure to present an independent medical expert.

Petitioner's first ineffectiveness claim relates to appellate and trial counsel's failure to consult with and present an independent medical expert. At trial, the State argued that Petitioner killed Ms. Frederick by hitting her in the head with an object, such as a brick or

rock.  Trial Tr. vol.  IV at 786, 795.  In support of this theory, the State offered, *inter alia*, the testimony of Dr. Harrison, the state medical examiner, and Dr. Hahn, the neurosurgeon that treated Ms. Frederick in the hospital.  Petitioner's trial counsel, James Rowan, cross-examined these witnesses but did not present an independent medical expert.  Petitioner claims that trial counsel's failure to retain an independent medical expert to rebut the State's theory regarding the manner of death rendered him ineffective and appellate counsel's failure to raise this claim on appeal rendered her ineffective.

During the direct appeal, Petitioner's appellate counsel, Gina Walker, contacted Dr. Robert Bux, (the same medical expert presented by Petitioner at the post-conviction evidentiary hearing), for the purpose of reviewing the Oklahoma Medical Examiner's conclusion that Ms. Frederick's death was a homicide.  Evidentiary Hr'g Tr. vol. II, 392.  Ms. Walker requested additional time in which to file her direct appeal brief in order to develop this information, but she did not receive a report from Dr. Bux by the deadline and, not knowing if his opinion would be helpful in any way, filed the direct appeal brief without reference to his opinion.  *Id.* at 394-396, *see also* Mot. for Extension of Time*, Frederick,* No. D-15-15.  Ms. Walker later filed a motion seeking to supplement her brief with a claim of ineffective assistance of trial counsel which was supported by a letter that Dr. Bux provided to her.  *See* Mot. to Stay Proceedings to Allow Supplementation of Appellant's Ineffective Assistance of Counsel Claim in his Brief-in-Chief as well as Supplementation of Appellant's 3.11B Motion, *Frederick*, No. D-2015-15.  The OCCA refused to consider the claim because its rules do not permit supplementation of a brief in this manner.  *See* Order Denying Motion to Supplement Appeal Record, *Frederick*, No. D-2015-15.

On post-conviction, Petitioner argued that the failure to timely present a trial counsel ineffectiveness claim based on the information from Dr. Bux rendered appellate counsel ineffective.  Original Appl. for Post-Conviction Relief at 22-25, *Frederick,* No. PCD-15-47.  After setting out the *Strickland* standard, the OCCA concluded that Petitioner was not prejudiced by appellate counsel's omission.[2]  *Frederick*, No. PCD-2015-47, slip op. at 11. Like the OCCA, this Court elects to dispose of Petitioner's claim by reviewing the prejudice prong of *Strickland.  Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Viewing the claim through AEDPA's deferential lens, the OCCA's conclusion that Petitioner was not prejudiced by appellate counsel's actions is not unreasonable.

At the post-conviction evidentiary hearing, Dr. Bux disagreed with the medical examiner's conclusion that the manner of death was homicide.  Evidentiary H'rg Tr. vol. II, 317, 341.  Dr. Bux testified that he would have listed the manner of death as

---

[2] Specifically, the OCCA ruled that "Petitioner has failed to show any prejudice by appellate counsel's alleged shortcomings as this Court has sufficient record to thoroughly review his claims for post-conviction relief."  *Frederick*, No. PCD-2015-47, slip op. at 11. The OCCA did not provide any further reasoning in support of its denial of this claim. Nevertheless, the claim is considered adjudicated on the merits for purposes of AEDPA. *Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.")  Thus, AEDPA applies and, even though the "state court's decision is unaccompanied by an explanation," Petitioner still carries the burden of "showing there was no reasonable basis for the state court to deny relief."  *Id*. at 98.  Notably, the parties agree that AEDPA applies to the OCCA's decision with respect to the prejudice prong of *Strickland*.

undetermined and pointed to the fact that there was no evidence of a struggle at the scene, no evidence of defensive injuries, no physical evidence on any potential weapons, and no external abrasions or bleeding.[3]  *Id.* at 323, 341, 353, 366-367.   He testified that Ms. Frederick's injuries were consistent with an accidental fall or a fall that could have resulted from a medical event, such as a stroke.  *Id.* at 340.

In *Harrington v. Richter*, 562 U.S. at 112, the Supreme Court held that the state court reasonably concluded the defendant was not prejudiced by trial counsel's failure to call a blood evidence expert because the expert testimony "established nothing more than a theoretical possibility" that was consistent with the defense theory and counsel was able to "extract[] a concession along these lines from the prosecution's expert" at trial. Similarly, here, Petitioner's expert offers nothing more than the possibility that Ms. Frederick's injuries were the result of a fall, a theory which was explored by defense counsel at trial.

During the cross-examination of Dr. Harrison, the state medical examiner, trial counsel inquired about Ms. Frederick's pre-existing medical conditions and elicited testimony that pre-existing medical conditions can make a person more susceptible to a subdurmal hematoma.  Trial Tr. vol. 5, 1138-1140.  Trial counsel also elicited testimony that individuals taking aspirin, which the jury had previously been told was the case for Ms. Frederick, were more susceptible to bleeding in the brain.  *Id.* at 1140.  Dr. Harrison

---

[3] In concluding there were no abrasions or bleeding on Ms. Frederick, Dr. Bux questioned the accuracy of an emergency room record noting that the victim appeared with "abrasion and contusion."   *Id.*  344-345.   Additionally, at trial, Dr. Hahn, Ms. Frederick's neurosurgeon, testified that she had lacerations on her face.  Trial Tr. vol. 5, 1019.

further testified that he did not see any remarkable bruising on the left side of Ms. Frederick's face and that he was not provided with a potential weapon to help him determine what caused the injuries. *Id.* at 1141. This line of questioning by Petitioner's trial counsel was clearly meant to undermine Dr. Harrison's conclusion as to the manner of death and demonstrate that it was possible for Ms. Frederick to experience a severe brain bleed from an accidental fall. Additionally, during his cross-examination of Ms. Diggs, trial counsel was able to impeach her with prior testimony showing that Ms. Frederick had previously suffered an accidental fall. *Id.* at 860-863.

There was also sufficient evidence presented at trial apart from the medical testimony presented to establish Petitioner's guilt. This was not, as Petitioner argues, a case that hinged entirely on expert medical testimony. In addition to the testimony of Dr. Harrison and Dr. Hahn, the prosecution presented testimony from thirteen other witnesses. Testimony from these witnesses showed that immediately preceding the incident, Petitioner shoved Ms. Frederick, engaged in a heated phone conversation where his older brother told him he had to move out of the house, physically fought with Ms. Diggs, and chased Ms. Diggs with a brick or rock. Trial Tr. vol. VI, 823-824, 830-832, 833-835, 898, 923. Ms. Diggs testified that when the police asked Ms. Frederick who injured her, Ms. Frederick responded by making the sign for Petitioner's name.[4] *Id.* at 840. Thus, even if counsel had presented an expert to testify that Ms. Frederick's injuries were consistent with a fall or that the manner of death could not be determined, there was still significant

---

[4] The admissibility of Ms. Frederick's statement is addressed in part III(B).

13

circumstantial evidence establishing Petitioner's guilt. *See Harrington*, 562 U.S. at 113 (holding that defendant was not prejudiced by failure to introduce expert testimony because there was "sufficient conventional circumstantial evidence pointing to [his] guilt."). Given this evidence, and the concessions trial counsel elicited from the State's witnesses, it was not unreasonable for the OCCA to conclude that appellate counsel's omission of an ineffectiveness claim based on the failure to present an independent medical expert did not prejudice Petitioner.

In attempting to overcome AEDPA, Petitioner argues that the OCCA engaged in unreasonable factfinding to the extent that it ignored certain "frailties in the State's case."[5] The Court doubts that "ignoring evidence can be considered a factual determination." *Wood v. Carpenter*, 907 F.3d 1279, 1298 (10th Cir. 2018). But in any event, Petitioner fails to show that OCCA did not consider any alleged weaknesses in the State's case in assessing whether counsel was ineffective. Rather, the OCCA reasonably concluded that that any weaknesses were eclipsed by the other evidence pointing to guilt.

Petitioner also argues that the OCCA's decision is an unreasonable application of *Strickland* and its progeny, specifically *Hinton v. Alabama,* 571 U.S. 263 (2014). In

---

[5] Petitioner also points out that the OCCA's direct appeal opinion erroneously states that the victim's skull was crushed. *Frederick*, 400 P.3d at 798-799. This finding is indeed inaccurate – the victim's skull was not crushed. *See* Evid. Hr'g Tr. vol. II, 284. The OCCA made this statement while addressing Petitioner's claim regarding the sufficiency of the evidence in support of the heinous, atrocious, or cruel aggravator. *Frederick*, 400 P.3d at 798-799. The OCCA did not include this statement in its recitation of the facts, *id.* at 817, and the isolated statement was not referenced in the OCCA's post-conviction decision. There is no indication that the OCCA relied on this misstatement in reaching its decision as to this subclaim.

*Hinton*, 571 U.S. at 274-275, the Supreme Court held that trial counsel performed deficiently when he presented an expert that he himself believed was inadequate because he mistakenly thought he could not acquire additional funds to hire a competent expert. The Supreme Court did not, however, make a determination as to prejudice. *Id.* at 275-276.  Thus, the OCCA's prejudice determination cannot be contrary to or an unreasonable application of *Hinton. See Williams*, 529 U.S. at 365 (explaining that clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions.")

In order to establish prejudice, the "likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.  Given the concessions trial counsel extracted through cross-examination and the circumstantial evidence of Petitioner's guilt, it was reasonable for the OCCA to conclude that Petitioner would not have prevailed on appeal had appellate counsel presented an ineffectiveness claim incorporating Dr. Bux's testimony.  Because the OCCA's finding that appellate counsel's omission did not prejudice the defense is reasonable, Petitioner is not entitled to relief on this claim.

b.　　　　Failure to adequately cross-examine Dr. Harrison.

Petitioner next argues that appellate counsel was ineffective for failing to raise an ineffectiveness claim regarding trial counsel's inadequate cross-examination of Dr. Harrison.  Dr. Harrison testified that at the conclusion of his autopsy, he determined Ms. Frederick's cause of death to be blunt force trauma and the manner of death to be homicide. Trial Tr. vol. V, 1134-1135.  Prior to completing his autopsy report, an "Investigator's

Narrative," completed by an Investigator from the medical examiner's officer, was made available to Dr. Harrison.   Evidentiary Hr'g. Tr. vol. II, 276-278. The Investigator's Narrative inaccurately states that the victim's "[g]randdaughter witnessed the assault."[6]  *Id.* at 276.  Dr. Harrison incorporated this information into his autopsy report when he stated "[decedent] was reported to have been assaulted with an apparent brick by her son (as witnessed by the decedent's granddaughter)."  *See* Evidentiary Hr'g Def. Ex. 3.

Petitioner complains that defense counsel did not ask Dr. Harrison whether he had an opinion regarding the cause of Ms. Frederick's injury and failed to exploit his reliance on the incorrect information contained in the Investigator's Narrative.   Petitioner also complains that the prosecutor misstated Dr. Harrison's testimony during closing argument but trial counsel failed to object to or correct this misstatement.[7]  Addressing only the prejudice prong of *Strickland*, the OCCA concluded that "Petitioner cannot show any prejudice resulting from counsel's omissions as he has failed to show a substantial likelihood of a different result on appeal." *Frederick*, PCD-15-47, slip op. at 15-16.  This conclusion is not unreasonable.

Petitioner first argues the OCCA unreasonably found that Dr. Harrison's opinion on the manner of death was not dependent on the inaccurate information in the Investigator's

---

[6] Petitioner does not contest the accuracy of the other information contained in the Investigator's Narrative.

[7] The parties dispute whether the failure to object to the prosecutor's misstatement of the evidence has been exhausted, and if so, whether it has been adjudicated on the merits.  It is not necessary to resolve this dispute because, even under *de novo* review, this particular subclaim would not merit relief.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Narrative.   In support of his argument, Petitioner points to the fact that Dr. Harrison incorporated some of the inaccurate information into the comments section of his autopsy report and testified that the Investigator's Narrative "did weigh very heavily along with the other information I received."   Evidentiary Hr'g. Tr. vol. II, 303.   The problem for Petitioner, however, is that Dr. Harrison also unequivocally testified that he stands by his original finding and his opinion about the manner of death would not change even if he had never reviewed the erroneous information in the Investigator's Narrative.   *Id.* at 301-302.   If Dr. Harrison's opinion would have been the same even without the inaccurate information, it is certainly not unreasonable for the OCCA to conclude that his opinion was not dependent on the information.

Petitioner next argues that the OCCA unreasonably ignored portions of the record in finding that Dr. Harrison did not take the Investigator's Narrative "to mean that the granddaughter actually witnessed Petitioner hit the decedent in the head with a brick but that she witnessed the assault in general terms." *Frederick*, PCD-15-47, slip op. at 14-15. However, Dr. Harrison specifically testified that his interpretation of the Investigator's Narrative was not that the granddaughter actually saw Petitioner strike Ms. Frederick with an object but instead that she witnessed the assault in general terms.   Evidentiary Hr'g Tr. vol. II, 301. The fact that he included the mistaken information in his autopsy report does not undercut his testimony about how he interpreted the information or render the OCCA's finding unreasonable.

Petitioner also challenges the OCCA's finding that "regardless of any incorrect information in the Investigator's Narrative, [Dr. Harrison's] opinion that the death was a

homicide would not have changed." *Frederick*, PCD-15-47, slip op. at 15.   Petitioner claims this finding is unreasonable because Dr. Harrison testified that he could not rule out a fall as the cause of Ms. Frederick's injury based on an examination of the body alone. *Id.* at 282.   While Dr. Harrison did testify that he could not rule out an accidental fall based on a physical examination alone, *id*. at 282, he also testified that the physical examination was not the only information he considered in reaching his conclusion.   *Id*. at 273-274; 297-300.   In addition to the Investigator's Narrative and his autopsy results, Dr. Harrison reviewed law enforcement and hospital records where witnesses described an altercation that preceded Ms. Frederick's injury which included Petitioner chasing Ms. Frederick's granddaughter out of the house with a rock or brick.   *Id.*   at 297-300.   Dr. Harrison also testified that his opinion would not change even if he had never reviewed the misstatement in the Investigator's Narrative.   *Id*. at 301-302.   The OCCA's finding that Dr. Harrison's opinion on the manner of death would not have changed even without the erroneous information is therefore clearly supported by the record.

Petitioner also claims the OCCA's decision is an unreasonable application of *Strickland* because undermining the medical examiner's opinion as to the manner of death was crucial to the defense theory that Ms. Frederick was injured by a fall.   While undermining the medical examiner's conclusion would have been helpful to the defense, a more thorough cross-examination would not necessarily have achieved that goal. At the evidentiary hearing, Dr. Harrison agreed that Ms. Frederick's injuries "at least could have been caused by a rock or brick" and he denied that his opinion on the manner of death would have changed had he never seen the erroneous information in the Investigator's

Narrative.  Evidentiary Hr'g Tr. vol. II, 300-301.  Accordingly, if trial counsel had more thoroughly cross-examined Dr. Harrison on these issues, as post-conviction counsel did at the evidentiary hearing, Dr. Harrison would likely have provided testimony that was consistent with the State's theory.

Further, trial counsel's failure to correct or object to the prosecutor's misstatement of Dr. Harrison's testimony does not undermine confidence in the outcome of the proceeding.  During closing argument, the prosecutor stated that "[i]n their opinion [referring to Dr. Hahn and Dr. Harrison] this was not consistent with a fall."  Trial Tr. vol. VI, 1228.  Dr. Hahn did indeed state, numerous times, that Ms. Frederick's injuries were more severe than he would expect from a person falling. Trial Tr. vol. V, 1012-1013, 1015, 1023, 1024-1025, 1027-1028.  Although Dr. Harrison did not testify at trial that the injuries were not consistent with a fall, his opinion was clearly that the injuries were not caused by a fall, as evidenced by the fact that he classified the manner of death as a homicide.  Dr. Harrison reiterated and stood behind this opinion at the evidentiary hearing.  In any event, the jury was instructed that closing argument is not evidence, O.R. vol. 5, 875, and the Court must presume the jury followed these instructions.  *Hooper v. Mullin*, 314 F.3d 1162, 1173 (10th Cir. 2002).

Under *Strickland*, 466 U.S. at 695, Petitioner bears the burden of showing that "the decision reached would reasonably likely have been different absent the errors."  And under AEDPA, he must show that the OCCA "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002). Given the evidence at trial and the additional evidence presented at the evidentiary hearing, the Court

cannot conclude that that the OCCA applied *Strickland* in an objectively unreasonable manner when it concluded that Petitioner did not suffer prejudice from appellate counsel's omission of an ineffectiveness claim related to trial counsel's cross-examination of Dr. Harrison.  Petitioner is not entitled to relief on this claim.

### 3. *Analysis of Sentencing Stage Ineffectiveness Claims*

Petitioner's sentencing stage claims focus on appellate counsel's failure to raise ineffectiveness claims related to trial counsel's failure to reasonably investigate and present compelling mitigation evidence. During the sentencing stage, the State incorporated the evidence introduced during the guilt stage and presented fifteen witnesses, including some of Petitioner's family members. The witnesses testified about Petitioner's prior criminal history, including a 1981 burglary, Trial Tr. vol. VII. 1302 - 1330, a 2003 incident where Petitioner allegedly assaulted patrons at a hair salon, *id.* at 1339 – 1388, and several incidents where Petitioner was violent towards family members or neighbors.  *Id.* at 1390 – 1457.

The defense presented no live witnesses during the sentencing stage.  The only evidence presented by defense counsel was a portion of a 1982 post-conviction hearing transcript containing the testimony of Petitioner's deceased father.  *Id.* at 1496-1514.  The post-conviction hearing related to Petitioner's 1972 robbery prosecution.  *Id.* at 1497.  Via the transcript, Petitioner's father testified that Petitioner was in a car accident where he "hit his head on the windshield" and was a "changed child from that very moment." *Id.* at 1498. He described Petitioner as being "quiet" and "very easygoing," but that he changed after the car accident.  *Id.* at 1499.  He further testified that Petitioner "led a pretty sheltered

life," that he "ran away from home" at the age of fourteen, and that his criminal conviction resulted in "a harsh judgment that he wasn't physically and mentally able to cope with." *Id.* at 1497-1501, 1506-1507. The testimony also indicated that Petitioner's father did not know where Petitioner was living at the time, did not attend Petitioner's criminal trial, and did not visit Petitioner in jail. *Id.* at 1501-1505.

Based on this evidence, the defense offered five mitigators: (1) Petitioner had an accident in a truck and hit his on the windshield and was a changed child from that very moment, (2) Petitioner's break with his father which led to him leaving home at age fourteen had a negative impact on his development, (3) Petitioner has become institutionalized which has caused him to become suspicious of other people and overly aggressive, (4) Petitioner has never learned to live as a free man and is unable to cope with the stress and strain of society, and (5) Petitioner's father never took an interest in Petitioner after he left home at the age of fourteen.[8]  O.R. vol. V, 927. During closing argument, defense counsel argued that Petitioner "never had a chance" because he was in an adult prison by the age of sixteen and that his violent actions may be attributable to the head injury he suffered as a child.  Trial Tr. vol. VIII, 1580-1581, 1585-1587.

In challenging the effectiveness of his trial and appellate counsel, Petitioner points to three specific areas of mitigation evidence that he claims counsel failed to adequately

---

[8] The defense revised its mitigators to conform to the evidence after the State argued there was no evidence presented in support of certain proposed mitigators.  Trial Tr. vol. VIII, 1525-1528.

investigate and present: testimony from family members, testimony from sociologist Dr. Art Williams, and evidence of organic brain damage.

a.   Testimony from Family Members.

Petitioner contends that trial counsel was ineffective for failing to identify and call certain family members to the stand who could have provided information about Petitioner's troubled background and testified about his positive attributes, including the care he provided to Ms. Frederick.  Four of these family members testified at the post-conviction evidentiary hearing: Petitioner's younger brother, Jerome Frederick; Petitioner's second cousin, Latisha Long Miller; Petitioner's second cousin, Latrena Sloan; and Petitioner's aunt, Johnita Cole.

Jerome Frederick testified that he and Petitioner grew up in a strict, religious household where they would get "spanked with a rubber hose" or an extension cord if they were being "disobedient."  Evidentiary Hr'g Tr. vol. I, 124-125.  He further testified that his father had extra-marital affairs, was accused of having relationships with female members of his church, was accused of inappropriate sexual behavior by a young relative, and that Ms. Frederick eventually sought a protective order and a divorce.  *Id.* at 121-123.  Jerome also testified that Petitioner left home at age fourteen after his father hit him in the face. *Id.* at 128.

Ms. Sloan, Ms. Long Miller, and Ms. Cole testified regarding the care Petitioner provided to Ms. Frederick, such as buying her groceries and cooking. *Id.* at 65, 81, 94.  They admitted that at least some of their knowledge regarding Petitioner's relationship with Ms. Frederick was not based on personal observations but was instead relayed by Petitioner

or other family members.  *Id.* at 75, 87, 101.  They each stated that they would have asked the jury to spare Petitioner's life if they had been called to testify during the trial.  *Id.* at 68-69, 82, 100-101.

Trial counsel and appellate counsel also testified at the evidentiary hearing. Their testimony indicates that Petitioner was originally represented by Catherine Hammarsten of the Oklahoma County Public Defender's Office.  Evidentiary Hr'g Tr. vol. III, 566.  Ms. Hammarsten testified that during the course of her representation she tried to locate records related to Petitioner and that she "looked for every family member we could."  *Id.* at 591, 609-610.  Her investigation revealed that some family members could not be located, some were not viable witnesses, and some were not willing to assist the defense.  *Id.* at 591-592, 595-596.  Ms. Hammarsten did, however, locate two family members that she believed were viable witnesses: Johnita Cole and Latisha Long Miller.  *Id.* at 592.  Ms. Hammarsten interviewed Ms. Cole and Ms. Long Miller and believed they "were good witnesses."  *Id.* at 630.  She subsequently included them on the witness list she filed in the case.  *Id.* at 592; O.R. vol. IV, 604-505.

Following a break down in the attorney-client relationship, James Rowan replaced Ms. Hammarsten as lead trial counsel. Evidentiary Hr'g Tr. vol. I, 188.  Mr. Rowan believed the case had been "thoroughly investigated" by the time he took it over and that Ms. Hammarsten "left no stone unturned."  *Id.* at 189, 213.  He had access to Ms. Hammarsten's entire file, including notes from meetings and information about which family members the defense team was still trying to locate.  *Id.* at 606.  Mr. Rowan did not interview either of the witnesses listed by Ms. Hammarsten but did read their witnesses

summaries. *Id.* at 206, 234-235. He further testified that he "had no strategic reason" for not interviewing family witnesses, that he "blew them off completely," and that he simply did not put in the work and effort necessary to incorporate them into the mitigation case. *Id.* at 206, 239.

In resolving this claim, the OCCA focused on the merits of the underlying trial counsel ineffectiveness claim. Noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," the OCCA determined that trial counsel's performance was not deficient because his choice to not present family witnesses was a "reasonable, strategic decision." *Frederick*, PCD-15-47, slip op. at 29-32. Petitioner challenges the OCCA's decision as unreasonable, arguing that the OCCA improperly deferred to counsel's choice even though it was not strategic and was not the product of an adequate investigation.

Before analyzing Plaintiff's sentencing stage ineffectiveness claims, it bears repeating that the Court's role under AEDPA is not to evaluate "whether defense counsel's performance feel below *Strickland's* standards." *Harrington*, 562 U.S. at 101. Rather, "the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* This is a "substantially higher threshold." *Schriro*, 550 U.S. at 473. Moreover, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). To succeed under this doubly deferential review, Petitioner must show that the OCCA's ruling "was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Petitioner challenges the OCCA's deference to Mr. Rowan's decision not to put on family members, arguing that he could not have made a fully informed strategic choice because the underlying investigation was insufficient. In reaching its decision, the OCCA noted that Ms. Hammarsten testified to an "extensive investigation she and her staff conducted to locate family members."[9] *Frederick*, PCD-15-74, slip op. at 23. Indeed, Ms. Hammarsten testified that she knocked on a number of doors, acquired available records, and did all she could to locate family members. Evidentiary Hr'g Tr. vol. I, 189; vol. III, 591, 597, 610. Despite her efforts, Ms. Hammarsten was not able to locate certain family witnesses, including Jerome Frederick. *Id.* at 595-597. In making tactical judgments about how to proceed in the case, Mr. Rowan was entitled to rely on the investigative work performed by prior counsel. *See Wilson v. Sirmons*, 536 F.3d 1064, 1136 (10th Cir. 2008) (Hartz, J., concurring) ("It is well-settled counsel may rely on the efforts of co-counsel, investigators, and experts in preparing for trial.").

Viewing the case from counsel's perspective at the time, it would have been reasonable for Mr. Rowan to decide that spending additional time and resources tracking

---

[9] Petitioner takes issue with the OCCA's characterization of Ms. Hammarsten's investigation as "extensive" because she did not describe or could not remember certain details about the investigation. Of course, it is not at all surprising that Ms. Hammarsten could not remember every detail of an investigation that occurred several years prior. Ms. Hammarsten testified she and her investigator did "all that [they] could" to locate potential witnesses and Mr. Rowan agreed that the case looked "thoroughly investigated" by the time he took it over. Evid. Hr'g Tr. vol. I, 189, vol. III, 591.

down the missing family members would not have been productive. *Harrington*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). *Strickland* permits an attorney to "make a reasonable decision that makes a particular investigation unnecessary." *Strickland,* 466 U.S. at 691. Mr. Rowan knew that prior counsel's attempts to locate Petitioner's additional family members were unsuccessful. He also knew that many of Petitioner's siblings did not have a close relationship with him. Evidentiary Hr'g Tr. vol. I, 205. Given this knowledge, "it was at least arguable that a reasonable attorney could forego further inquiry" into locating the missing family members. *Harrington*, 562 U.S. at 106. Accordingly, the OCCA's conclusion that trial counsel was not ineffective for failing to locate additional family members is not unreasonable.

As for Ms. Cole and Ms. Long Miller, whom prior counsel listed on her preliminary witness list, a reasonable jurist could also conclude that Mr. Rowan's decision not to pursue their testimony or present them at trial was a legitimate tactical choice. Although Ms. Hammarsten thought "they were good witnesses," it would not have been unreasonable for Mr. Rowan to decide, based on the witness summaries filed by Ms. Hammarsten, that their testimony would not be helpful or credible.[10]  *See Rompilla v. Beard*, 545 U.S. 374, 383

---

[10] Petitioner challenges the OCCA's finding that the majority of Ms. Cole's and Ms. Long Miller's testimony was based on hearsay as both factually and legally unreasonable, but the Court is not persuaded. First, while the witnesses testified to some first-hand observations, much of their testimony was indeed based on information relayed to them by Petitioner or others. Evid. Hr'g Tr. vol. I, 75, 105. Second, while it is true that mitigation evidence is not necessarily inadmissible or less valuable when it is based on reliable

(2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.").  The witness summaries provided by Ms. Hammarsten indicate that Ms. Cole and Ms. Long Miller would testify that Ms. Frederick did not fear Petitioner, Petitioner felt the family left most of the responsibility for caring for Ms. Frederick to him, and Petitioner loves his family.  O.R. vol. IV, 604-605.  When contrasted with the compelling testimony that was to be provided by more immediate family members, including some of Ms. Frederick's adult children, a reasonable attorney could conclude that presenting testimony from these extended family members would not be persuasive.

Further, Mr. Rowan's sentencing stage argument mainly focused on the fact that Petitioner was on his own from a young age and suffered a head injury during a childhood car accident.  Trial. Tr. vol. VII, 1292-1300; vol. VIII, 1577-1590.  Neither of the family members listed on Ms. Hammarsten's witness list appeared to have any direct knowledge of these circumstance apart from "family stories."  O.R. vol. IV, 604-605.  Therefore, the OCCA's conclusion that defense counsel reasonably investigated family witnesses and strategically chose not to present them has support in the record.

---

hearsay, *see Sears v. Upton*, 561 U.S. 945, 950 (2010), the OCCA's determination that the testimony was less compelling because it was based on statements by the Petitioner or others was not unreasonable.  Third, while it may be reasonable to conclude, as the Petitioner suggests, that Mr. Rowan could not have harbored concerns about the testimony being based on hearsay at the time he made his decision not to present family witnesses, it is also reasonable to conclude, based on the witnesses summaries filed in the case, that Mr. Rowan was aware that at least some of the testimony was based on statements by Petitioner and that the remainder was either not helpful to his mitigation strategy or not credible.

The dilemma here is that Mr. Rowan's own testimony regarding his trial strategy directly conflicts with the OCCA's conclusion that his decision was a strategic one. At the evidentiary hearing, Mr. Rowan testified that "he had no strategic reason" for not calling family members.  Evidentiary Hr'g Tr. vol. I, 206.  He further testified he would have "started talking to [family members] when he first got on the case if I knew they were supportive" and that he "blew them off completely."  *Id.* at 206, 239.  When asked if he knew Ms. Hammarsten had spoken to two family witnesses, he testified "I am now more than I was then."  *Id.* at 234.  This testimony, Petitioner argues, makes it clear that Mr. Rowan did not have a strategic reason for not calling Petitioner's family members and renders the OCCA's decision unreasonable.

This Court does not dispute that Mr. Rowan's statements are troubling. Without context, Mr. Rowan's testimony appears to be a bald admission that there was no reasoned strategy behind his actions and that he was possibly not even aware that prior counsel had interviewed two cooperative family witnesses.  Certainly, at minimum, any competent attorney would make themselves aware of the witnesses identified by prior counsel and perform their own independent assessment of whether their proposed testimony merited further exploration.  But *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."  *Harrington*, 562 U.S. at 109.  And while courts "may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions… neither may they insist counsel confirm every aspect of the strategic basis for his or her actions."  *Id.* (internal citation ommitted).  Although Mr. Rowan may subjectively believe, viewing the

28

case with the "distorting effects of hindsight," *Strickland*, 466 U.S. at 689, and perhaps "magnify[ing] [his] own responsibility for an unfavorable outcome," *Harrington*, 562 U.S. at 109, that that he "blew it," the OCCA's conclusion that other testimony at the evidentiary hearing showed he did have strategic reasons for not calling family members to the stand is not so unreasonable that there is no room for fairminded disagreement.

Mr. Rowan testified that in a capital trial the sentencing stage is the "be all end all" and is "all I care about most of the time in a capital murder."  Evidentiary Hr'g Tr. vol. I, 235.  Given the import Mr. Rowan rightly places on the sentencing stage, the OCCA's skepticism of Mr. Rowan's self-deprecating statements is not without justification.  Mr. Rowan also testified that he did not think a mitigation case focused on Petitioner's father's extra-marital affairs and the dysfunctional family dynamic "would fly" and that it "was very dangerous." *Id.* at 237.  Thus, he had clearly put some thought into whether presenting family members to testify regarding Petitioner's upbringing was an appropriate mitigation strategy, which undercuts his claim that he had no strategic reason for not interviewing family members.  He further testified that although he had a difficult time communicating with his client, he "continued to try to, you know, work the case up and prepare myself." *Id.* at 211.  Given this testimony, it was reasonable for the OCCA to conclude that Mr. Rowan's decision to not present family witnesses was the product of a tactical judgment rather than sheer neglect. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

Petitioner also challenges the OCCA's conclusion that electing not to call Jerome Frederick as a witness would have been sound trial strategy.[11]  Although Jerome Fredrick was able to provide some insightful testimony about Petitioner's dysfunctional upbringing and childhood head injury, he also had information concerning Petitioner's violent past, including allegations that Petitioner sexually assaulted two women in his own family. Evidentiary Hr'g Tr. vol. I, 120-126, 152-155.  Further, Jerome Frederick's credibility was at least questionable given his own criminal background.[12]   *Id.* at 158-161, 181-182. Notably, the trial judge who presided at the evidentiary hearing found Jerome Frederick's proposed testimony so fraught with risk that he believed presenting him as a mitigation witness could have given rise to an ineffective assistance of counsel claim.  Order of Feb. 9, 2018 at 31, *Frederick*, PCD-15-47.  Given the risks related to introducing further testimony about Petitioner's violence towards his own family, the OCCA's conclusion that declining to call Jerome Frederick as a witness was a sound strategic decision was reasonable.

---

[11] Petitioner asserts that Mr. Rowan could not have been in a position to make a strategic decision not to call Jerome Frederick because he failed to conduct a reasonable investigation into locating him. As explained supra at 25-26, Mr. Rowan's decision not to continue to search for Jerome Frederick was reasonable.

[12] While summarizing Jerome Frederick's testimony, the OCCA stated: "Jerome also knew of Petitioner's 2009 guilty pleas to assaulting DaJon Diggs and the decedent." *Frederick*, PCD-15-47, slip op. at 28.  But it was Jerome, not Petitioner, who pled guilty to assaulting Ms. Diggs and Ms. Frederick in 2009.  Nonetheless, this error does not fatally corrupt the OCCA's analysis of this claim because, in addition to the misstatement regarding the 2009 assault, the OCCA correctly noted that Jerome testified about several other violent acts involving Petitioner.  The OCCA's decision does not rest upon this misstatement and is therefore not a basis for relief.  *See Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011).

Petitioner also takes issue with the OCCA's statement that "there is no indication [Petitioner's family] did anything to make themselves available to testify at trial." *Frederick*, PCD-15-47, slip op. at 30-31.  Petitioner argues that this statement shows the OCCA unreasonably blamed Petitioner's family for the lack of mitigation witnesses.  But the very next sentence of the OCCA's opinion states that "[c]ounsel will not be found ineffective for failing to call family members who could not, despite due diligence, be located."  *Id*.  Thus, the OCCA appears to be remarking on the difficulties counsel faced in locating witnesses, not blaming Petitioner's family.

Petitioner also argues that the OCCA unreasonably placed the burden on Petitioner to prepare a mitigation case when it stated that "[Mr. Rowan] testified that Petitioner was not helpful in preparing a mitigation case as he felt he was innocent and that mitigation evidence was unnecessary."  *Id.* at 25.  But again, when read in full, it appears this portion of the OCCA's opinion is simply highlighting the challenges counsel faced in developing mitigation evidence, not placing the burden on Petitioner to prepare his own mitigation case.

At the evidentiary hearing, Mr. Rowan testified that he had "blown it" before and that "perfection is something I strive for but rarely achieve."  Evidentiary Hr'g Tr. vol. I, 235.  But "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'"  *Harrington*, 562 U.S. at 110 (internal citations omitted).  Given *Strickland's* deferential standard, and the additional deference required by AEDPA, the Court cannot conclude that the OCCA's conclusion that trial counsel did not perform deficiently is so unreasonable that there is no possibility for fairminded disagreement.

31

The OCCA also concluded that Petitioner was not prejudiced by the omission of family witnesses.  Petitioner challenges this conclusion by arguing that the OCCA utilized the wrong standard in determining prejudice when it stated that "even if further evidence of Petitioner's troubled childhood was introduced, it is not clear it would have been sufficient to mitigate Petitioner's adult criminal conduct." *Frederick*, PCD-15-47, slip op. at 33.  The OCCA correctly recited the *Strickland* standard at the outset of its discussion of the ineffectiveness claims and the Court must presume the state court knew and followed the law.  *Wood v. Carpenter*, 907 F.3d 1279, 1303 (10th Cir. 2018).  Thus, rather than "dissecting every sentence of a state court's ruling to ensure all is in good order," the Court will properly focus on "the reasonableness of the state court's decision."  *Grant v. Royal*, 886 F.3d 874, 906 (10th Cir. 2018).

To show prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable."  *Harrington*, 562 U.S. at 112.  Here, the State put on a strong case in aggravation, showing that Petitioner had a history of violent confrontations.  In contrast, the testimony of Ms. Cole, Ms. Sloan, and Ms. Long Miller was far from compelling and their credibility was undermined by the testimony of Tobias Frederick, who disputed some of the statements made by these witnesses.  Evidentiary Hr'g Tr. vol. III, 526-529, 533-537.  While Jerome Frederick was able to provide some mitigating testimony regarding abuse and dysfunction during Petitioner's upbringing,[13] "evidence of childhood abuse or

---

[13] Petitioner also challenges the OCCA's finding that "[m]any of the incidents of physical abuse and discord in the household and misdeeds of Petitioner's father occurred after Petitioner left home." *Frederick*, PCD-15-47, slip op. at 33. This finding is reasonable

neglect isn't always severe enough to earn a jury's sympathies." *Grant v. Trammell*, 727 F.3d 1006, 1021 (10th Cir. 2013); *see also Foster v. Ward*, 182 F.3d 1177, 1189 (10th Cir. 1999) (explaining that "[w]e have on numerous occasions determined that evidence of a troubled childhood involving physical, emotional, sexual and/or substance abuse does not outweigh evidence supporting the conviction and evidence supporting multiple aggravating circumstances; nor does evidence of low I.Q. and/or organic brain damage."). Further, evidence of childhood abuse "is generally less persuasive when a defendant commits the capital offense later in life," which is the case here. *Grant*, 727 F.3d at 1021.

In short, a reasonable jurist could conclude that Jerome Frederick's testimony regarding Petitioner's strict upbringing, spankings with a hose, Petitioner being punched by his father, and his father's extra-marital affairs is not equivalent to the "severe privation and abuse" that the Supreme Court has described when finding prejudice. *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (finding prejudice where counsel failed to introduce evidence of severe childhood abuse and neglect by alcoholic mother and repeated sexual abuse in multiple foster homes); *Williams v. Taylor*, 529 U.S. 362, 395 and n. 19 (2000) (finding prejudice where counsel failed to introduce evidence that defendant's parents were imprisoned for child neglect, defendant was severely and repeatedly beaten by his father, and defendant spent time in an abusive foster home). Additionally, even conceding that Petitioner's evidence of childhood abuse and dysfunction is mitigating, the OCCA could reasonably conclude that it was outweighed by the aggravating evidence, including

---

given that Petitioner left home in the early 1970s when Jerome Frederick was only eight or nine years old. Evidentiary Hr'g Tr. vol. I, 137.

Petitioner's history of violent confrontations.[14]  *See Grant*, 727 F.3d at 1021 (noting that a "record of violent felonies" may outweigh mitigating evidence of childhood abuse or neglect.)

The OCCA's conclusion that trial counsel was not ineffective, and therefore appellate counsel was not ineffective for failing to raise this claim, is not unreasonable. Petitioner is therefore not entitled to relief on this claim.

> b.  Failure to call Dr. Art Williams.

Petitioner's next argument concerns appellate counsel's failure to include a written report by sociologist Dr. Art Williams as part of her claim that trial counsel was ineffective for failing to present this witness.[15]  During his sentencing stage opening statement, trial counsel told the jury that they would hear testimony from Dr. Williams regarding Petitioner's upbringing, learning disabilities, and time in prison, but he rested his mitigation case without calling this witness.  Trial Tr. vol. VII, 1292-1300.  At the close of evidence, Mr. Rowan explained that he decided not to call Dr. Williams because Petitioner "never

---

[14] Petitioner also complains that the OCCA's prejudice analysis failed to consider the positive evidence family members could have provided. The OCCA summarized the positive evidence provided by the family members who testified at the evidentiary hearing, and there is nothing to suggest that it did not consider this evidence when performing its analysis.

[15] Respondent asserts that the claim raised by appellate counsel on direct appeal was merely that trial counsel was ineffective for failing to call the witness after telling the jury he would do so, not that trial counsel was ineffective for actually failing to present the witness. The Court believes that Respondent parses the claim too narrowly. Additionally, the post-conviction claim encompasses trial counsel's decision to not present the witness and the OCCA resolved that claim in its opinion.  *Frederick*, PCD-15-47, slip op. at 33 ("On direct appeal, we thoroughly reviewed trial counsel's alleged ineffectiveness and found his decision not to call Dr. Williams to testify was reasonable trial strategy.")

interacted with Dr. Williams" and "he would have been eminently cross-examinable." *Id.* at 1515-1516. At the evidentiary hearing, Mr. Rowan further explained that he chose not to call Dr. Williams because he believed the prosecutor would have "torn him up on the stand" and he did not want the jury to hear any information about Petitioner's prior acquittal for capital murder. Evidentiary Hr'g Tr. vol. I, 201, 230.

On direct appeal, appellate counsel argued that Mr. Rowan's failure to call Dr. Williams after telling the jury they would hear from him resulted in ineffective assistance and that Mr. Rowan's decision was not a reasonable trial strategy because any concerns he had with Dr. William's testimony would have been known to him prior to making opening statements. Brief for Appellant at 96-97, *Frederick,* D-15-15. Appellate counsel did not include Dr. Williams' pretrial report with her direct appeal brief. The OCCA ruled that "counsel's decision not to call the witness, despite his comment in opening statements, was reasonable trial strategy." *Frederick*, 400 P.3d at 831. The OCCA further ruled that Petitioner failed to show prejudice, noting that, "[a]s defense counsel told the trial court, much of what Dr. Williams would have testified to was already before the jury in the form of testimony from other witnesses." *Id.*

On post-conviction, Petitioner argued that Dr. Williams' report was necessary to show prejudice and appellate counsel performed deficiently by failing to include it. *Frederick*, PCD-15-47, slip op. at 33. In denying the claim, the OCCA restated its direct appeal finding that trial counsel did not perform deficiently and then concluded that "[a]ppellate counsel will not be found ineffective as the claim was sufficiently raised in the direct appeal." *Id.*

Petitioner now argues the OCCA's finding that the claim was sufficiently raised on direct appeal is unreasonable because, by omitting Dr. Williams' report, appellate counsel failed in her duty to show that trial counsel's actions prejudiced the defense. Petitioner asserts that he was prejudiced by appellate counsel's omission because there is a reasonable probability the OCCA would have found trial counsel ineffective if the report had been included on direct appeal.

In evaluating an ineffective assistance of counsel claim, a court "may address the performance and prejudice components in any order, but need not address both if [petitioner] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292–93 (10th Cir. 1998). Here, it was reasonable for the OCCA to conclude that appellate counsel was not ineffective because, even assuming appellate counsel performed deficiently by failing to include Dr. Williams' report, it is not likely the OCCA would have reached a different conclusion on direct appeal regarding the reasonableness of trial counsel's performance.[16] In other words, Petitioner cannot show he was prejudiced by appellate counsel's omission because the OCCA would still have found that trial counsel did not perform deficiently even if it had the benefit of Dr. Williams' report.

---

[16] Petitioner argues that the OCCA's post-conviction opinion did not make a clear finding regarding the prejudice prong of his appellate ineffectivenes claim and it is therefore not entitled to AEDPA deference. Generally, when a state court disposes of an ineffectiveness claim without specifying which prong it is relying on, AEDPA deference applies to both prongs. *Premo v. Moore*, 562 U.S. 115, 123 (2011). However, even under *de novo* review, Petitioner cannot show that he suffered any prejudice from appellate counsel's failure to include Dr. Williams' report.

The OCCA's finding that trial counsel's decision not to call Dr. Williams as a mitigation witness was reasonable trial strategy is itself a reasonable conclusion.   Mr. Rowan's statements at trial and his testimony at the evidentiary hearing indicate that multiple factors contributed to his decision not to present Dr. Williams.   Petitioner argues that Mr. Rowan's belated decision to not present Dr. Williams cannot be attributed to reasonable trial strategy because at least some of these factors were known to him well before the trial started.   Multiple factors often inform a lawyer's decision as to which witnesses to present and the mere fact that the lawyer may be weighing these factors well in advance of making a final decision does not render the ultimate decision any less strategic.   Further, it is not uncommon for a lawyer to adjust his trial strategy based on how the trial actually proceeds.   That appears to be just what happened in this case.

At trial, Mr. Rowan stated that when he made his sentencing stage opening statement, he believed Dr. Williams was going to testify. Trial Tr. vol. VIII, 1515-1516. The next day, he made the decision not to call him.   *Id.*; Evidentiary Hr'g Tr. vol. I, 232. Mr. Rowan explained that he was concerned with how Dr. Williams' testimony would stand up to cross-examination given that Petitioner did not interact with Dr. Williams during their meeting and Dr. Williams performed no testing on Petitioner.[17]   Trial Tr. vol VIII, 1516.   Mr. Rowan also explained that the prosecution had not introduced any evidence of Petitioner's prior murder acquittal and he did not want to give the prosecution

---

[17] Contrary to Petitioner's assertion, Mr. Rowan's testimony about being concerned that Petitioner did not interact with Dr. Williams supports the OCCA's finding that counsel's decision not to call Dr. Williams was based in part on Petitioner's failure to cooperate. *Frederick*, 400 P. 3d at 831.

an opportunity to elicit this information through Dr. Williams or a rebuttal expert. *Id.* at 1522, Evidentiary Hr'g Tr. vol. I, 201. In fact, the decision not to call Dr. Williams prevented the prosecution from introducing testimony that Petitioner had previously made statements denying a brain injury. Trial Tr. vol. VIII, 1517. To be sure, Dr. Williams would have been able to provide helpful mitigating testimony about Petitioner's background and institutionalized mindset.[18] But preventing the jury from hearing testimony about Petitioner's prior capital murder charge and statements undermining his alleged brain injury were valid tactical objectives. As trial counsel had Dr. Williams on call for the mitigation stage, his decision appears to be the product of a reasoned tactical judgment based on how the trial progressed rather than neglect or incompetence.

Perhaps in hindsight a different decision would have been better, particularly given the lack of other mitigating evidence Mr. Rowan had available. But *Strickland* requires the Court to "evaluate conduct from counsel's perspective at the time" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Calling Dr. Williams to the stand

---

[18] Respondent argues that the Court cannot consider any of Petitioner's state post-conviction attachments, including Dr. Williams' report, because they were not introduced at the evidentiary hearing. Of course, review under AEDPA is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. 170, 181 (2011). Dr. Williams' report, although not introduced at the evidentiary hearing, was attached to Petitioner's post-conviction application and was therefore available to the state court. App. to Appl. for Post-Conviction Relief at Attach. 32. The OCCA also referenced some of Petitioner's post-conviction attachments in its opinion, which suggests that these attachments were considered by the state court. *Frederick*, PCD-15-47, slip op. at 23, 34. But the Court need not definitively determine the matter because, even taking the report into consideration, Petitioner cannot prevail on this claim. *See Hooks v. Workman*, 689 F.3d 1148, 1193 (10th Cir. 2012).

risked introducing evidence of Petitioner's prior capital murder charge whereas not calling him risked losing the opportunity to present evidence of Petitioner's institutionalized mindset. "Faced with these two alternatives,…neither option…so clearly outweighs the other that it was objectively unreasonable for the [OCCA] to deem counsel's choice…a tactical decision about which competent lawyers might disagree." *Bell*, 535 U.S. 685, 701–02 (2002).

Having reasonably concluded that trial counsel did not perform deficiently, the OCCA was not likely to reach a different result on appeal even if appellate counsel had included Dr. Williams' report for the purpose of establishing prejudice. While the report would have given the OCCA additional information regarding the scope of Dr. William's testimony, it does not undermine the OCCA's conclusion that trial counsel's decision was within the wide range of competent professional advice permitted by *Strickland*. Because it is reasonably likely the OCCA would have found trial counsel did not perform deficiently regardless of whether Dr. Williams' report was included with the appeal, Petitioner cannot show that he suffered any prejudice from appellate counsel's omission. The OCCA's conclusion that trial counsel's decision not to call Dr. Williams was reasonable trial strategy and their conclusion that appellate counsel was not ineffective because she sufficiently raised the claim on appeal is therefore reasonable. Petitioner is not entitled to relief on this claim.

c. Failure to introduce evidence of brain damage.

For his final ineffectiveness claim, Petitioner contends that his trial counsel performed deficiently by failing to present expert testimony regarding brain damage and

appellate counsel performed deficiently by failing to raise a claim based on trial counsel's error. He argues that trial and appellate counsel were aware of numerous "red flags" indicating that Petitioner suffered from brain damage but they failed to reasonably investigate this avenue of mitigation evidence.

At the evidentiary hearing, Petitioner presented testimony from two medical experts: Dr. Curtis Grundy, a clinical psychologist, and Dr. Antoinette McGarrahan, a neuropsychologist. Dr. Grundy testified that he met with Petitioner and administered several psychological tests. Evidentiary Hr'g Tr. vol. IV, 679-684. Based on his evaluation, Dr. Grundy diagnosed Petitioner with paranoid personality disorder and anti-social personality disorder. *Id.* at 687, 729. A personality disorder is not a mental illness and Dr. Grundy testified that he did not diagnose Petitioner with a mental illness. *Id.* at 705-706; 729. He further testified that long term treatment for personality disorders is difficult but that it tends to improve with age. *Id.* at 706. Dr. Grundy was also concerned that Petitioner's childhood car accident and participation in a prison boxing team may have resulted in brain damage and recommended he be evaluated by a neuropsychologist. *Id.* at 693-694, 721-722.

Petitioner was subsequently evaluated by Dr. McGarrahan. Dr. McGarrahan administered a battery of neuropsychological tests and concluded that Petitioner has "significant indicators of brain damage," including "an overall reduction in his intellect" and impairment to his frontal lobes. *Id.* at 763. Like Dr. Grundy, Dr. McGarrahan did not diagnose Petitioner with a traditional mental illness. *Id.* at 796.

The OCCA held that that Mr. Rowan did not perform deficiently in failing to present any mental health evidence and that Petitioner was not prejudiced by its absence at trial. Regarding deficient performance, the OCCA concluded:

> As the trial court stated in its order, it is apparent Mr. Rowan wants to convince us that he took no action to prepare mental health evidence for trial. However, the reliability of this testimony is questionable in light of his experience as a capital litigator and his testimony regarding the crucial importance of the mitigation stage of a capital trial. His testimony showed he did speak to Dr. Williams and did try to get Petitioner evaluated by mental health experts. However, Petitioner would not cooperate. Testimony shows Petitioner also did not cooperate with Ms. Hammarsten's efforts to have him evaluated. It would be questionable to put any sort of mental health evidence before the jury where the Petitioner had not been personally interviewed and evaluated. The record before us shows that Petitioner only cooperated with the mental health experts after he had been convicted and given the death sentence. We agree with the trial court's findings that the mental health information provided by the defense at the Evidentiary Hearing was not available to trial counsel due to Petitioner's refusal to cooperate and participate in any testing or evaluation. "[I]t is the competent client's case, not the lawyers. While, counsel has the responsibility to advise, inform, and consult with the client, the defendant has the right be involved in the decision process that will affect his or her life." *Lott v. State,* 2004 OK CR 27, ¶ 164, 98 P.3d 318, 357 *citing Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
>
> Here, no question was raised to Petitioner's competency to stand trial. There is no indication he disagreed with counsel's decision not to present additional mitigating evidence. In fact it was Petitioner who prevented the further presentation of just such evidence. Contrary to Mr. Rowan's protestations, the record shows his decision not to present any mental health evidence was a strategic choice made after reasonable investigation and within the exercise of reasonable professional judgment.

*Frederick*, PCD-15-47, slip op. at 38-40.

Petitioner argues that the OCCA's decision is an unreasonable application of *Strickland* because trial counsel did not perform a reasonable mental health investigation. He further argues that the OCCA unreasonably considered Mr. Rowan's experience as a

capital litigator, unreasonably used Petitioner's alleged lack of cooperation to justify the failure to investigate, and unreasonably suggested that the decision as to what mitigating evidence to present lay with the client. Petitioner also objects to nearly every line quoted above as an unreasonable factual determination.

To begin, there can be no disputing that Mr. Rowan was aware that Petitioner potentially suffered from brain damage. Not only was he alerted to it by Dr. Williams' pretrial report, but he made the effects of Petitioner's childhood head injury the central theme of his mitigation case. Despite embracing Petitioner's head injury as the reason for his violent actions, Mr. Rowan never consulted with an expert trained to diagnosis or evaluate brain damage. Evidentiary Hr'g Tr. vol. I, 204.

The OCCA attributes the lack of expert mental health testimony in this case to Petitioner's failure to cooperate with evaluation or testing. *Frederick*, PCD-15-47, slip op. at 38-40. True, Petitioner was not cooperative with Dr. Williams and Ms. Hammarsten testified that Petitioner "was adamant he would not take testing from anyone" and "wouldn't meet with psychologists." Evidentiary Hr'g Tr. vol. III, 610. But Mr. Rowan replaced Ms. Hammarsten as Petitioner's counsel precisely *because* Petitioner was not cooperating with her. *See* App. to Appl. for Post-Conviction Relief at Attach. 18-19. Ms. Hammarsten testified that Petitioner "was so happy to be getting rid of me, yes, he would've cooperated with somebody else." Evidentiary Hr'g Tr. vol. III, 621. Further, the state court judge who presided over the replacement of Ms. Hammarsten advised Petitioner that a new lawyer would bring experts in to speak with him, but these actions were not taken by Mr. Rowan. App. to Appl. for Post-Conviction Relief at Attach. 18. Because

Mr. Rowan was specifically brought into the case in order to restore the attorney/client relationship, using Petitioner's lack of cooperation with Ms. Hammarsten as justification for Mr. Rowan's failure to consult with a mental health expert is problematic.

While Mr. Rowan testified that he did not think Petitioner "was particularly interested in being examined by a neuropsych," he also testified that his conversations with Ms. Hammarsten "clouded [his] judgment in trying to talk [Petitioner] into having somebody examine [Petitioner]," and that he made an assumption regarding Petitioner's cooperation with experts. Evidentiary Hr'g Tr. vol. I, 203, 245-246. While an attorney is not unreasonable for not pursuing investigations he determines would be fruitless based on conversations with his client, *Strickland*, 466 U.S. at 691, Mr. Rowan testified that Petitioner never told him that he would not cooperate with a mental health expert. *Id.* at 204. Given this testimony, and Mr. Rowan's concession that he did not consult with a mental health expert or try to have Petitioner evaluated by a mental health expert, *id.* at 204, it is difficult to see how the OCCA could reasonably conclude that Mr. Rowan "did try to get Petitioner evaluated by mental health experts." *Frederick*, PCD-15-47, slip op. at 38.

Further, the fact that Petitioner may have been uncooperative or obstinate does not relieve counsel of the duty to perform a reasonable mitigation investigation. *Porter v. McCollum*, 558 U.S. 30, 40 (2009). Where counsel is aware of possible brain damage and chooses to make it a central theme in his mitigation case, one would expect counsel to at least attempt to have his client evaluated by a qualified mental health expert, even if he anticipated that the client may not actively participate in the evaluation. Ultimately,

however, the Court need not resolve whether the OCCA reasonably found that counsel's investigation into mental health evidence was sufficient, because Petitioner cannot carry his burden of showing that the OCCA's finding as to prejudice is unreasonable.

In regards to prejudice, the OCCA found that "there is no reasonable probability that the omitted mental health evidence would have altered the outcome of the sentencing stage of trial." *Frederick*, PCD-15-47, slip op. at 41. Petitioner presents several challenges to this decision. First, he challenges the OCCA's factual finding that Dr. McGarrahan concluded Petitioner's brain damage "would not impair his day to day activities, and that she could not draw any connection between any brain damage and his criminal conduct." *Id.* at 40. Although Dr. McGarrahan testified that organic brain damage was "certainly a contributing factor" to his behaviors, she also testified that she could not make a "direct link" between brain damage and any crime committed. Evidentiary Hr'g Tr. vol. IV, 785-786, 79. She further testified that while brain damage could cause difficulties with "making complex decisions," "abstract reasoning," and "interacting with people," she did not presently see any diminution in Petitioner's day to day to activities. *Id.* at 781-782. Thus, the OCCA's factual finding has clear support in the record.

Petitioner next challenges the OCCA's finding that "[i]nformation from the mental health experts in this case could reasonably be viewed as mitigating to one person and aggravating to another." *Frederick*, PCD-15-47, slip op. at 41. He points to the following testimony by Dr. McGarrahan in arguing that evidence of his brain damage would not have indicated future dangerousness:

> I think early on when you couple the damage to the frontal lobes with his young age and hormones that are going on at a young age, you get the unprovoked aggression. You typically don't see unprovoked aggression even with frontal lobe damage in individuals who are in their fifth and sixth decade of life. At this point he's becoming more docile and having more difficulties in his thinking than he is in his behavior.

Evidentiary Hr'g Tr. vol. IV, 791. While this testimony may be useful in rebutting the State's future dangerousness aggravator, it also undercuts Petitioner's argument that his brain damage somehow explains his violent acts. Petitioner was in his fifties when he committed this crime, which, according to his own expert, is a time when "[y]ou typically don't see unprovoked aggression even with frontal lobe damage." *Id.* Thus, while Petitioner may wish to portray this testimony as mitigating, it can also reasonably be interpreted as showing that Petitioner's brain damage is not the cause of his violent outbursts and he is instead just a violent person. Further, presenting evidence of Petitioner's brain damage would have involved testimony regarding Petitioner's anti-social personality disorder, a diagnosis that "tends to present an aggravating, rather than mitigating, circumstance in the sentencing context." *Littlejohn v. Royal*, 875 F.3d 548, 564 (10th Cir. 2017). Accordingly, the OCCA's conclusion that the evidence presented at the evidentiary hearing could be viewed as mitigating to one person and aggravating to another is reasonable.

Petitioner's third challenge takes issue with the OCCA's determination that "the introduction of organic brain damage…would have given the State ample ground to underscore and highlight [Petitioner's] antisocial personality evidence before the jury." *Frederick*, PCD-15-47, slip op. at 40. He argues that the OCCA unreasonably failed to

take into account testimony from Dr. McGarrahan that would have blunted the negative impact of Petitioner's anti-social personality disorder diagnosis, including her testimony that "the etiology [of Petitioner's anti-social personality disorder] is at least part due to brain damage."  Evidentiary Hr'g Tr. vol. IV, 795.  There is nothing to suggest that the OCCA failed to consider Dr. McGarrahan's complete testimony.  Further, even if some of Dr. McGarrahan's testimony would have potentially blunted the negative impact of Petitioner's diagnosis, this does not change the fact that the State would be able to highlight this typically aggravating condition.

Last, Petitioner argues that that OCCA's decision unreasonably applied *Strickland* by discounting the potential value of the testimony provided by Dr. Grundy and Dr. McGarrahan.  To be sure, evidence of organic brain damage can have a "powerful mitigating effect."  *See  Hooks*, 689 F.3d at 1205; *see also Wilson*, 706 F.3d at 1310; *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir. 2004).  But the strength and persuasiveness of mental health evidence in the sentencing phase is often dependent upon showing that it contributed to a defendant's criminal actions.  *Hooks,* 689 F.3d at 1204 ("[c]ounsel in capital cases must explain to the jury why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question"); *see also Smith*, 379 F.3d at 943 (noting that expert testimony could have provided the jury with "an explanation of how [the defendant's] organic brain damage caused these outbursts of violence"); *Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007) (noting that readily available mitigating evidence, including evidence of organic

brain damage, "could have both explained to the jury the reasons [defendant] was predisposed to act in concert with [his co-defendants] on the night of the murders and demonstrated [he] was less morally culpable than the average defendant for committing the murders.").

Here, the strength and persuasiveness of Petitioner's organic brain damage as mitigating is significantly reduced because he cannot "connect the dots" between his brain damage and his commission of the crime.  *Hooks*, 689 F.3d at 1204.  As previously explained, Petitioner's expert, Dr. McGarrahan, testified that "[y]ou typically don't see unprovoked aggression even with individuals with frontal lobe damage in their fifth or sixth decade of life."  Evidentiary Hr'g Tr. vol. IV, 791.  Petitioner was in his fifties when he committed this crime, and many of the other violent acts alleged by the State also occurred later in his life.  As he committed these violent acts during a time period when unprovoked violence is not typically exhibited, his brain damage does not provide a compelling explanation for his behavior.

The difficulty Petitioner faces in connecting his brain damage to his violent behavior, combined with the aggravating evidence of antisocial personality disorder and the strength of the State's aggravation case, provide a reasonable basis for the OCCA to conclude that there is no reasonable probability that evidence of Petitioner's brain damage would have altered the sentencing outcome.  *See Littlejohn v. Royal*, 875 F.3d 548, 564 (10th Cir. 2017) (finding no prejudice where evidence "did not reveal that [defendant's] alleged organic brain damage played a substantial role in engendering his life of criminal deviance.").  As the OCCA's decision that Petitioner was not prejudiced by trial counsel's

performance is reasonable, their conclusion that appellate counsel was not ineffective is also reasonable. Petitioner is not entitled to relief on this claim.

### 4. Conclusion

In order for the Court to find for Petitioner on his claims related to trial and appellate counsel ineffectiveness, Petitioner must show that the OCCA's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. In other words, he must show that all fairminded jursits would agree that the OCCA got it wrong. *Lockett v. Trammell,* 711 F.3d 1218, 1231 (10th Cir. 2013). He cannot make this showing.

As the OCCA acknowledged, "[a]t first blush, Mr. Rowan's presentation of a single second stage witness, presented only through the reading of a transcript from a prior proceeding, and the omission of any mental health experts, seems to be an obvious case for a finding of ineffectiveness." *Frederick*, PCD-15-47, slip op. at 41. However, the OCCA ultimately concluded that Petitioner "failed to overcome the strong presumption that trial counsel rendered adequate assistance." *Frederick*, PCD-15-47, slip op. at 43. AEDPA restricts the Court's review to a determination of whether the OCCA's conclusion is an unreasonable application of Supreme Court precedent or based on an unreasonable factual determination. *Harrington,* 562 U.S. at 100. Under this standard, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102. Whatever the Court may have decided were it reviewing Petitioner's claims with a clean slate, it cannot conclude that all fairminded jurists would agree that the OCCA's decision

regarding Petitioner's ineffectiveness claims was wrong.   Accordingly, Petitioner is not entitled to relief on Ground 1.

**B.  Ground Two: Confrontation Clause Claim**

Petitioner's second ground for relief asserts that the admission of out of court statements by Ms. Frederick violated his Sixth Amendment right to confront the witnesses against him. At trial, Ms. Diggs testified that after contacting 911 and entering the house with law enforcement, a male police officer asked her to ask Ms. Frederick whether she was in pain and "who did it?" Trial Tr. vol. IV, 840.  Ms. Frederick communicated through sign language and Ms. Diggs acted as an interpreter.  *Id.* at 810-811.  Ms. Diggs testified that Ms. Frederick responded to the question by making the sign for Petitioner's name.  *Id.* at 840.  In addition to Ms. Diggs' testimony, paramedic Adam Simmons testified that he asked Ms. Diggs to elicit information from Ms. Frederick in order to assess her medical situation.  *Id.* at vol. V, 989-992.  Mr. Simmons testified that, as relayed by Ms. Diggs, Ms. Frederick communicated that "her son" was responsible for her injuries and that she was hit an unknown number of times with an object.  *Id.* at 991-992.

On direct appeal, Petitioner argued that the admission of Ms. Frederick's out-of-court hearsay statements violated the Sixth Amendment's Confrontation Clause. *Frederick*, 400 P.3d at 805.  The OCCA found that the statements were nontestimonial and therefore did not implicate the Confrontation Clause.  *Id.* at 807.  Applying the deference required by AEDPA, the Court finds that the OCCA's decision was reasonable.

*1.  Clearly Established Law*

The Sixth Amendment's Confrontation Clause provides that "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  In *Crawford v. Washington*,  541 U.S. 36, 53–54, (2004), the Supreme Court limited the Confrontation Clause's reach to "testimonial statements."  The Court held that in order for testimonial statements to be admissible, the out-of-court witness must be unavailable and the defendant must have had a prior opportunity to cross examine the witness.  *Id.*  In *Davis v. Washington*, 547 U.S. 813 (2006), and *Hammon v. Indiana*, 547 U.S. 813 (2006), which were decided together, the Supreme Court defined more precisely the distinction between testimonial statements and nontestimonial statements. The Supreme Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822.

In *Michigan v. Bryant*, 562 U.S. 344, 358 (2011), the Supreme Court affirmed that when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause."  To determine the primary purpose of an interrogation, courts must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties."  *Id*. at 359.  In making this determination, the "existence of an emergency or the parties' perception that an emergency is ongoing is

among the most important circumstances." *Id*. at 370.  However, "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the 'primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency.'" *Id*. at 374.

     *2. Analysis*

The OCCA determined that when Ms. Frederick identified Petitioner as her assailant, the primary purpose of the questioning was to render medical aid and allow the police to respond to an ongoing emergency. *Frederick*, 400 P.3d at 807.  In reaching this conclusion, the OCCA found that "[a]t the time the victim identified [Petitioner] as her attacker, police did not know if [Petitioner] was still in the house, if he was armed, if he had left the house or if he was likely to return." *Id.*  Petitioner challenges this factual finding as unreasonable because the State's opening statement indicated that a witness saw Petitioner leave the house before law enforcement arrived.    Trial. Tr. vol IV at 793.  Neither the State's opening statement nor the witness' testimony undermines the OCCA's finding that *law enforcement* did not know whether the Petitioner was still in the house. The police arrived at the residence in response to a 911 call placed by Ms. Diggs. *Id.* at 793.  Ms. Diggs saw Petitioner enter the house but did not see him leave prior to the police arriving. *Id.* at 847.  When the police arrived, Ms. Diggs told them what happened and that she feared for her grandmother's life. *Id.* at 949.  There was no testimony that anyone told the first responders that Petitioner had left the premises. The OCCA's factual finding is therefore reasonable.

Petitioner additionally contends that the OCCA's decision is an unreasonable application of *Crawford, Davis,* and *Bryant.* Petitioner argues that because Ms. Frederick's statements were not made simultaneous with the assault, as was the case in *Davis*, 547 U.S. at 827, and did not include the use of a gun in a public place, as was the case in *Bryant*, 562 U.S. at 359, the OCCA's reliance on these cases is unreasonable. Petitioner's interpretation of these cases is too restrictive. *Davis,* 547 U.S. at 827-831, and *Bryant*, 562 U.S. at 363, make clear that determining the primary purpose of an interrogation is a context specific inquiry that requires an objective analysis of all the relevant circumstances. Here, the OCCA reasonably concluded that the relevant circumstances objectively indicate that the primary purpose of the interrogation was to render medical aid and respond to on ongoing emergency.

The police arrived at the scene shortly after Ms. Diggs placed the 911 call. Trial. Tr. vol. IV, 837. When the police entered the home, the location of Petitioner, and whether he posed a continuing threat to the officers, the victim, or anyone else, was not clear. *Id.* at 838, 847. Police officers entered the house in order to assist injured people and detain any threats. *Id*. at 950, 959-960. They located Ms. Frederick in her bedroom. *Id.* at 950-951. Ms. Frederick was startled, bruised, and not able to get up on her own. *Id.* at 950-951, 960. While some officers attended to Ms. Frederick, other officers cleared the house. *Id.* Ms. Diggs, who entered the home behind law enforcement, testified that the police instructed her to ask Ms. Frederick whether she was in pain and "who did it?" *Id.* at 840. These inquiries were rendered at the scene, shortly after the assault took place, while the victim was still struggling on the ground and the perpetrator's location was unknown.

These circumstances and the general "informality of the situation," "suggest that the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency." *Bryant*, 562 U.S. 377. Further, given Ms. Frederick's startled and injured condition, it is unlikely that "a person in [Ms. Frederick's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at 375 (quoting *Davis*, 547 U.S. at 822).

In *Davis*, the Supreme Court observed that law enforcement's "initial inquiries" when responding to a call will "often…produce nontestimonial statements" because they "'need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.'" 547 U.S. at 832 (quoting *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 186 (2004)). Here, the circumstances of the encounter and the statements by Ms. Frederick and the police objectively indicate that the interrogation's primary purpose was to respond to the exigency of the moment, not "simply to learn…what had happened in the past." *Davis*, 547 U.S. at 827. At the very least, the OCCA's conclusion in that regard is not unreasonable.

As for the statements elicited by Mr. Simmons, the paramedic, Petitioner identifies no Supreme Court case law clearly establishing that statements made to medical personnel, as opposed to law enforcement, are testimonial. *See Ohio v. Clark*, 576 U.S. 237, 135 S. Ct. 2173, 2181 (2015)) (explaining that statements to individuals who are not law enforcement officers "are much less likely to be testimonial than statements to law enforcement officers"); *Giles v. California*, 554 U.S. 353, 376, (2008) (explaining that

"[s]tatements to friends and neighbors…and statements to physicians in the course of receiving treatment" would not be excluded by the Confrontation Clause.)  The absence of clearly established federal law prohibiting the admission of Mr. Simmons' testimony is fatal to this aspect of Petitioner's claim.  *Grant v. Royal*, 886 F.3d 874, 888 (10th Cir. 2018).

Even assuming that statements to medical personnel could implicate the Confrontation Clause, the circumstances involved here indicate that the primary purpose of Mr. Simmons' questioning was to respond to a medical emergency.  Mr. Simmons testified that it was important to get information from Ms. Frederick about what caused her injuries in order to provide her with the medical treatment.  Trial Tr. vol. V, 990.  Thus, Mr. Simmons questions were designed to assess the victim's medical situation, not to "create a record for trial," and are therefore outside the scope of the Confrontation Clause. *Bryant*, 562 U.S. 344 at 358.

The OCCA's determination that Ms. Frederick's elicited statements were nontestimonial, and their admission at trial therefore did not violate the Confrontation Clause, is reasonable.  Accordingly, Petitioner is not entitled to relief on Ground Two.

## C. Ground Three: Prosecutorial Misconduct

In his third ground for relief, Petitioner argues that he was deprived a fair trial and reliable sentencing proceeding as a result of certain comments made by the prosecutor during guilt and penalty stage closing arguments.  Petitioner raised these claims on direct

appeal and the OCCA denied relief.  Applying AEDPA's deferential standard, the Court

concludes that the OCCA's decision was not unreasonable.[19]

### 1. Clearly Established Law

Prosecutors can litigate with "earnestness and vigor" and are allowed to "strike hard

blows."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  But prosecutors may not strike

foul blows.  *Id.*  The line between hard and foul is an uncertain one, and even the Supreme

Court has admitted that "there is often a gray zone."  *United States v. Young*, 470 U.S. 1, 7

(1985).  To resolve prosecutorial misconduct claims, courts must first determine whether

misconduct even occurred.

If a prosecutor engaged in misconduct that deprived the petitioner of a specific

constitutional right, habeas relief is only warranted if the error had a substantial and

injurious effect in determining the jury's verdict.  *Matthews v. Workman*, 577 F.3d 1175,

1186 (10th Cir. 2009) (citing *Fry v. Pliler*, 551 U.S. 112, 121, 127 S. Ct. 2321, 2327, 168

L. Ed. 2d 16 (2007)).  Alternatively, if the misconduct does not implicate a specific

constitutional right, it ordinarily warrants relief only when the misconduct "so infected the

trial with unfairness as to make the resulting conviction a denial of due process."  *Le v.*

*Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (quoting *Donnelly v. DeChristoforo*, 416 U.S.

637, 643, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).  This analysis considers the trial as

---

[19] Because defense counsel did not object to any of the remarks at trial, the OCCA reviewed the claim for plain error.  *Frederick*, 400 P.3d at 822.  The plain error standard set for the by the OCCA in its opinion is akin to the due process standard this Court applies. The claim is therefore considered adjudicated on the merits for purposes of AEDPA.  *See Thornburg v. Mullin*, 422 F.3d 1113, 11-24-1125 (10th Cir. 2005).

a whole, and factors in the strength of the evidence, cautionary steps to counteract improper remarks, and defense counsel's failure to object. *Le*, 311 F.3d at 1013. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation marks omitted). Rather, the question is whether the petitioner was deprived of a fair trial or sentencing. *Id.*

> *2. Analysis*

Petitioner first challenges the following statement made by the prosecutor during her guilt-stage closing argument:

> And the question was asked, would you expect to see some other fractures if she just did a header, like, maybe some broken bones in her arms or someplace. And [Dr. Hahn] said yes.

Trial Tr. vol. VI, 1224-1225. Petitioner contends that the prosecutor misstated Dr. Hahn's testimony and misled the jury regarding the cause of Ms. Frederick's injuries. Dr. Hahn testified that the type of injuries he observed on Ms. Frederick were more than he would expect from a fall. *Id.* at vol. V, 1023-1025. When asked if he would expect to see some other injuries, such as fractures, if the person fell from a standing position, he responded that he "would expect to see some bruising." *Id.* at 1026. In denying relief on this claim, the OCCA held that "[t]he prosecutor's argument contained reasonable inferences from Dr. Hahn's testimony" and "[w]hile there was a misstatement or two of the testimony, these were minor misstatements which did not mislead the jury and could not have affected the outcome of the trial." Petitioner contends that the OCCA's characterization of the

prosecutor's misstatement as "minor" is unreasonable because the statement directly undermined Petitioner's first-stage defense.

The prosecutor did misstate the record when she said Dr. Hahn testified that he would expect to see some fractures if Ms. Frederick had done a "header." A prosecutor's misstatement of the record raises concerns because "jurors usually have no access to the testimonial record during deliberation" and the "risk that the prosecution's characterization would be remembered in lieu of the correct statement…is increased." *Le v. Mullin*, 311 F.3d 1002, 1020 (10th Cir. 2002). However, in light of Dr. Hahn's testimony that the injuries were more than he would expect from a fall, the OCCA's conclusion that the prosecutor's misstatement was "minor" and did not affect the outcome of the trial is reasonable.

Petitioner next contends that the following comment made by the prosecutor during sentencing stage closing arguments improperly sought sympathy for the victim:

> We're not here to do justice for [Petitioner]. He is not why we're here. We're here to do justice for Connie Frederick. That's why we're here."

Trial Tr. vol. VIII, 1590. The OCCA found that the comment was inappropriate, but "[g]iven the strength of the State's evidence against [Petitioner]," it "did not deprive [Petitioner] of a fair trial or affect the jury's assessment of punishment." *Frederick*, 400 P.3d at 825. Petitioner argues that the OCCA's erroneous statement that the victim's skull was crushed in several places demonstrates a misunderstanding of the evidence that renders their reliance on the "strength of the State's evidence" unreasonable.

Certainly, "[a]rguments that improperly encourage the jury to impose a sentence of death based on considerations of sympathy for the victims may constitute due process error." *Le*, 311 F.3d 1002, 1015 (10th Cir. 2002).  However, an inappropriate prosecutorial comment does not warrant reversal of a criminal conviction so long as the defendant received a fair trial.  *Matthews v. Workman*, 577 F.3d 1175, 1186 (10th Cir. 2009).  This inquiry requires the reviewing court to examine "the entire proceedings, including the strength of the evidence against the petitioner." *Le*, 311 F.3d at 1013.

After reviewing the entire record, the Court cannot agree with Petitioner's characterization of State's case as "extremely weak."  Even crediting Petitioner's argument that counsel should have presented additional evidence to rebut the medical examiner's classification of the death as a homicide, the State still had strong circumstantial evidence of Petitioner's guilt.   Further, the OCCA's incorrect statement regarding the victim's skull being crushed, which was made while addressing a challenge to the evidence supporting the heinous, atrocious, and cruel aggravator, does not undermine the OCCA's conclusion as to this claim because the OCCA outlined a strong aggravation case even without the erroneous statement. *Frederick*, 400 P.3d at 817-818.  Under federal law, it was certainly appropriate for the OCCA to address the strength of the State's case in assessing whether the prosecutor's remark rendered Petitioner's sentencing fundamentally unfair. *Le*, 311 F.3d at 1013.  Considering the evidence presented by the State during the entire proceeding, the OCCA's conclusion that the prosecutor's isolated remark did not deprive Petitioner of a reliable sentencing is reasonable.

Last, Petitioner contends that the following statements made by the prosecutor during sentencing stage closing arguments improperly denigrated Petitioner's mitigation evidence:

> I've heard mitigation evidence. Oh, boy, here we go with this. He was in a car wreck. How many people know – you know have been in a car wreck? His dad wasn't there. Whose dad was? He became institutionalized. That's it. Says, he became institutionalized because he was in prison. Okay. Let's reward him and put him where he wants to be.
>
> ***
>
> I say no more excuses, that's what I say. There aren't any excuses. You've heard nothing in this courtroom that says bumping his head in a car wreck caused him to live a life of violence and kill people, rob people, burglarize people. Absolutely not. He is mean. That's why he does these things, because he wants to. We try to make excuses. Oh, there's got to be something wrong. No, he's done this by choice because he's mean. And that's how he gets his way. Period.

Trial Tr. vol. VIII, 1591-1593. In denying relief on this claim, the OCCA concluded:

> …the prosecutor did not denigrate the mitigating evidence or tell the jury to ignore the evidence offered in mitigation. The prosecutor's argument merely attempted to minimize the effect of the evidence presented by the defense. Several of the comments were invited by defense counsel's closing argument…Further, the jury was appropriately instructed as to the mitigating evidence and was not in any way precluded from considering any and all mitigating evidence.

*Frederick,* 400 P.3d at 825 (internal citation omitted).

Petitioner contends this decision is unreasonable because the prosecutor's comments encouraged the jury to completely disregard the mitigation evidence.  But the prosecutor did not prevent any mitigating evidence from being presented or considered by the jury.  Instead, as the OCCA recognized, the prosecutor merely attempted to minimize the weight to be accorded to the mitigation evidence presented by Petitioner.  *See Bland v.*

*Sirmons*, 459 F.3d 999, 1026 (10th Cir. 2006) (rejecting prosecutorial misconduct claim because "[t]he prosecutors, while critical of [Petitioner's] mitigating evidence, never told the jury it could not consider [Petitioner's] mitigating evidence."). Further, the jury in this case was properly instructed regarding the mitigation evidence. O.R. vol. 5, 875; *Le*, 311 F.3d at 1013 (explaining that "[a]ny cautionary steps—such as instructions to the jury— offered by the court to counteract improper remarks may also be considered."). Looking at the remarks in context, it was not unreasonable for the OCCA to conclude that the prosecutor's remarks were proper.

### 3. Conclusion

The OCCA's ruling that the prosecutor's misstatement during her guilt stage closing argument did not render the proceeding fundamentally unfair is reasonable. The OCCA's ruling that the mitigation evidence comment was proper and the inappropriate sentencing stage comment was harmless is also reasonable. Accordingly, Petitioner is not entitled to relief on Ground Three.

## D. Ground Four: Cumulative Error

In his final ground for relief, Petitioner argues that the accumulation of errors violated his rights under the Sixth, Eighth, and Fourteenth Amendments. The OCCA found no cumulative error on direct appeal and found no constitutional errors on post-conviction review. *Frederick*, 400 P.3d at 832-833; *Frederick*, PCD-15-47, slip op. at 45.

The cumulative error analysis addresses the possibility that two or more individually harmless errors might have a "cumulative effect on the outcome of the trial such that collectively they can no longer be determined to be harmless." *Workman v. Mullin*, 342

F.3d 1100, 1116 (10th Cir.2003).  This analysis "aggregates all the errors that individually have found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id*.  To obtain habeas relief, the court must find that "the cumulative effect of the errors determined to be harmless had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Instances where courts find deficient performance by counsel must also be aggregated, even if the ineffectiveness claim was ultimately denied for insufficient prejudice. *Cargle v. Mullin*, 317 F.3d 1196, 120 (10th Cir. 2003).

The OCCA found, at most, two errors: the prosecution's misstatement of Dr. Hahn's testimony during the guilt stage closing argument and the prosecution's comment about seeking justice for the victim during the penalty stage closing arguments.  Even in the aggregate, and incorporating any ineffectiveness claims where deficient performance was assumed, the Court cannot conclude that these errors collectively had a substantial and injurious effect on Petitioner's conviction or sentence.  As already discussed, the State's case as to guilt and aggravation was strong, and even if Petitioner's defense or mitigation case were more thoroughly prepared, the Court is not persuaded the jury would have accepted that defense.  Accordingly, Petitioner is not entitled to relief on Ground Four.

## IV.  Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery [Doc. 21] seeking all district attorney files, documents that impeach certain witnesses, documents related to a redacted crime

report, and documents related to the parents of Petitioner.  He also seeks information as to whether employees of the Oklahoma County District Attorney's Office discussed Mr. Rowan's performance in capital cases.  Petitioner fails to provide any argument as to why discovery on these topics is necessary or what grounds for relief the requested discovery may support.  Petitioner appears to be seeking information to supplement his ineffective assistance of counsel claims and/or to support a possible *Brady* claim that prosecutor's wrongfully withheld exculpatory information.  Petitioner has not raised a *Brady* claim with this Court and has failed to present "specific allegations" showing that he may, if permitted to discover this information, be entitled to relief.  *Bracy v. Gramley*, 520 U.S. 899, 909 (1997).  Therefore, Petitioner has not shown good cause for discovery.  *See* Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts (requiring good cause to obtain discovery authorization).

In addition to his discovery request, Petitioner has also filed a motion for evidentiary hearing [Doc. 24] seeking a hearing "on all of the grounds and on all related factual contentions contained in the Petition."  "The purpose of an evidentiary hearing is to resolve conflicting evidence."  *Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 860 (10th Cir. 2005).  If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary.  *Id.* at 859.  An evidentiary hearing is unwarranted to resolve the legal issues presented by Petitioner's Petition for Writ of Habeas Corpus.  No information gained from an evidentiary hearing would affect the legal findings on those grounds.  Therefore, the requests for discovery and evidentiary hearing are denied.

### V.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief. Accordingly, Petitioner's Petition [Doc. 20], motion for discovery [Doc. 21], and motion for an evidentiary hearing [Doc. 24] are hereby **DENIED**.  A judgment will be entered accordingly.

IT IS SO ORDERED this 29th day of July, 2020.

**SCOTT L. PALK**
**UNITED STATES DISTRICT JUDGE**